ORAL ARGUMENT NOT YET SCHEDULED

No. 13-5202

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

MATT SISSEL,

Plantiff/Appellant,

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN
SERVICES; KATHLEEN SEBELIUS, in her official capacity as
United States Secretary of Health and Human Services; UNITED
STATES DEPARTMENT OF THE TREASURY; JACOB J. LEW,
in his official capacity as United States Secretary of the Treasury,

Defendants/Appellees.

On Appeal from the United States District Court
for the District of Columbia
Honorable Beryl A. Howell, District Judge

**APPELLANT'S OPENING BRIEF**

DANIEL A. HIMEBAUGH
Wash. Bar No. 41711
   Pacific Legal Foundation
   10940 NE 33rd Place, Suite 210
   Bellevue, Washington 98004
   Telephone:  (425) 576-0484
   Facsimile:  (425) 576-9565

PAUL J. BEARD II
Cal. Bar No. 210563
TIMOTHY SANDEFUR
Cal. Bar No. 224436
   Pacific Legal Foundation
   930 G Street
   Sacramento, California 95814
   Telephone:  (916) 419-7111
   Facsimile:  (916) 419-7747

Counsel for Plaintiff/Appellant Matt Sissel

# CERTIFICATE AS TO PARTIES, RULING, AND RELATED CASES

**Parties and Amici**

The following parties and amici appeared before the district court, and/or now appear before this Court:

Center for Constitutional Jurisprudence

Doug LaMalfa

Doug Lamborn

Jacob J. Lew

Jeff Duncan

Joe Barton

John Fleming

Kathleen Sebelius

Louie Gohmert

Mark Sanford

Marsha Blackburn

Matt Salmon

Matt Sissel

Michele Bachmann

Randy K. Weber, Sr.

Robert Pittenger

Steve Pearce

Timothy F. Geithner

Trent Franks

United States Department of Health and Human Services

United States Department of Treasury

## Ruling Under Review

The ruling under review is United States District Judge Beryl A. Howell's June 28, 2013, order dismissing Appellant Matt Sissel's amended complaint. App. at 120. The memorandum opinion accompanying that order can be accessed at ____ F. Supp. 2d ____ (D.D.C. 2013); 2013 WL 3244826. App. at 122-44.

## Related Cases

The case on review was not previously before this or any other court, save the proceedings in the district court below. Appellant is not aware of any related cases, as defined in Circuit Rule 28(a)(1)(C).

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Circuit Rule 26.1, Appellant hereby states that no corporation is a party to this suit, and no corporation has a financial interest in this case.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULING, AND RELATED CASES . . . . . . . i

CORPORATE DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . iii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

GLOSSARY OF ABBREVIATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

  I.  THE STANDARD OF REVIEW IS *DE NOVO* . . . . . . . . . . . . . . . . . . . . 5

 II.  THE INDIVIDUAL MANDATE EXCEEDS CONGRESS'S
     COMMERCE CLAUSE AUTHORITY . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      A.  The *NFIB* Court Upheld the Shared Responsibility
          Payment As a Tax, But Invalidated the Individual
          Mandate Under the Commerce Clause . . . . . . . . . . . . . . . . . . . . . . . 7

      B.  The District Court's Opinion Upholding the
          Individual Mandate in Spite of *NFIB* Means
          Sissel Will Be Required To Buy Insurance He
          Does Not Need or Want . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

III.  THE TAX LEVIED AGAINST INDIVIDUALS
     WITHOUT HEALTH INSURANCE VIOLATES
     THE ORIGINATION CLAUSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**Page**

A.  The Origination Clause Applies to the
    Shared Responsibility Payment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

B.  The Decision Below Adopted a New "Purposive"
    Exception to the Origination Clause That Ignores
    Binding Supreme Court Precedent . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

C.  The Shared Responsibility Payment Unconstitutionally
    Originated in the Senate, Not the House  . . . . . . . . . . . . . . . . . . . . . 20

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

ADDENDUM

STATUTES AND REGULATIONS

TABLE OF CONTENTS

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page**

## Cases

*Armstrong v. United States of America*, 759 F.2d 1378 (9th Cir. 1985) . . . . . . . 23

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Atherton v. Dist. of Columbia Office of the Mayor*,
    567 F.3d 672 (D.C. Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Bailey v. Drexel Furniture Co.*, 259 U.S. 20 (1922) . . . . . . . . . . . . . . . . . . . . . . . 17

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Boday v. United States of America*, 759 F.2d 1472 (9th Cir. 1985) . . . . . . . . . . 25

*Erickson v. Pardus*, 551 U.S. 89 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Flint v. Stone Tracy Co.*, 220 U.S. 107 (1911) . . . . . . . . . . . . . . . . . . . . . . . 21, 25

*Frent v. United States of America*, 571 F. Supp. 739
    (E.D. Mich. 1983), *appeal dismissed*, 734 F.2d 14 (6th Cir. 1984) . . . . . . . . 25

*Kinder v. Geithner*, 695 F.3d 772 (8th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . 11

*Liberty Univ., Inc. v. Lew*, 10-2347, 2013 WL 3470532
    (4th Cir. July 11, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10

*Millard v. Roberts*, 202 U.S. 429 (1906) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-16

\* *National Federation of Independent Business v. Sebelius*,
132 S. Ct. 2566 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-8, 10-13, 16-19

*Rainey v. United States*, 232 U.S. 310 (1914) . . . . . . . . . . . . . . . . . . . . . . . . 21, 25

Authorities upon which we chiefly rely are marked with asterisks.

**Page**

*Rodgers v. United States*, 138 F.2d 992 (6th Cir. 1943) . . . . . . . . . . . . . . . 15-17

*Seven-Sky v. Holder*, 661 F.3d 1 (D.C. Cir. 2011),
    *abrogated by NFIB*, 132 S. Ct. 2566 . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 18

*Sonzinsky v. United States*, 300 U.S. 506 (1937) . . . . . . . . . . . . . . . . . . . . 18-19

*Sperry Corp. v. United States*, 12 Cl. Ct. 736 (1987),
    *rev'd on other grounds*, 853 F.2d 904 (Fed. Cir. 1988) . . . . . . . . . . . . . . . 23

*Strauss v. Horton*, 46 Cal. 4th 364 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Twin City Bank v. Nebeker*, 167 U.S. 196 (1897) . . . . . . . . . . . . . . . . . 15-16, 18

*U.S. Citizens Ass'n v. Sebelius*, 705 F.3d 588 (6th Cir. 2013) . . . . . . . . . . . . 10-11

*United States v. Ashburn*, 884 F.2d 901 (6th Cir. 1989) . . . . . . . . . . . . . . . 15, 17

*United States v. Henry*, 688 F.3d 637 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . 8

*United States v. Kiste*, No. 3:12-CR-113JD
    2013 WL 587556 (N.D. Ind. Feb. 13, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Lott*, 912 F. Supp. 2d 146 (D. Vt. 2012) . . . . . . . . . . . . . . . . . . 8

*United States v. Loudner*, No. CR 12-30144-RAL
    2013 WL 357494 (D.S.D. Jan. 29, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Munoz-Flores*, 863 F.2d 654 (9th Cir. 1988),
    *rev'd on other grounds*, 495 U.S. 385 (1990) . . . . . . . . . . . . . . . . . . . . . . . 23

\* *United States v. Munoz-Flores*, 495 U.S. 385 (1990) . . . . . . . 4, 14, 16-18, 24-26

*United States v. Rose*, 714 F.3d 362 (6th Cir. 2013) . . . . . . . . . . . . . . . . . . . 10

*United States v. Roszkowski*, 700 F.3d 50 (1st Cir. 2012) . . . . . . . . . . . . . . . 8, 10

Page

*United States v. Spann*, No. 3:12-CR-126-L
  2012 WL 4341799 (N.D. Tex. Sept. 24, 2012) . . . . . . . . . . . . . . . . . . . . . . . . 8

*Windsor v. Evans*, 403 F. Appx. 527 (D.C. Cir. 2010) . . . . . . . . . . . . . . . . . . . 12

## United States Constitution

U.S. Const. art. I § 7, cl. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 14, 21

§ 8. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

§ 8, cl. 3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

§ 8, cl. 17 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## Statutes

26 U.S.C. 5000A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-10, 12

§ 5000A(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 6, 7, 9, 12

§ 5000A(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 7, 9, 16-17

§ 5000A(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

§ 1294(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

§ 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 8

## Rule of Court

Federal Rules of Civil Procedure 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . 3

Page

**Miscellaneous**

2 *Hind's Precedents of the U.S. House of Representatives* (1907) . . . . . . . . . . 22

9 Congressional Information Service S962194 . . . . . . . . . . . . . . . . . . . . . . . . . 20

155 Cong. Rec. S11888 (Nov. 20, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Annals of Cong. 9th Cong. 2d Sess. 630 (1807) . . . . . . . . . . . . . . . . . . . . . . . . 22

Barnett, Randy E., *No Small Feat: Who Won the Health
    Care Case (and Why Did So Many Law Professors
    Miss the Boat)?*, 65 Fla. L. Rev. 1331 (2013) . . . . . . . . . . . . . . . . . . . . . . . . 8

Frumin, Alan S., ed., *Riddick's Senate Procedure* (1992) . . . . . . . . . . . . . . . . . 24

House Resolution 3590 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20-21, 24-27

Lawson, Gary, *Night of the Living Dead Hand: The
    Individual Mandate and the Zombie Constitution*,
    81 Fordham L. Rev. 1699 (2012-2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

McKay, William & Johnson, Charles W., *Parliament
    and Congress: Representation and Scrutiny in the
    Twenty-First Century* (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Oullette, Alicia, *Health Reform and the Supreme
    Court: The ACA Survives the Battle of the
    Broccoli and Fortifies Itself Against Future
    Fatal Attack*, 76 Alb. L. Rev. 87 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Kurland, P., & Lerner, R. eds., 2 *The Founders' Constitution* (1987) . . . . . . . . 22

## GLOSSARY OF ABBREVIATIONS

Federal Rules of Civil Procedure ................................. FRCP

Patient Protection and Affordable Care Act ....................... PPACA

## STATEMENT OF JURISDICTION

This is an appeal from the United States District Court for the District of Columbia's June 28, 2013, order dismissing Appellant Matt Sissel's amended complaint. App. at 120. The district court had subject-matter jurisdiction pursuant to 28 U.S.C. § 1331. The district court's order is final and appealable. App. at 120. Sissel filed a timely notice of appeal on July 5, 2013. This Court is authorized to review the district court's order under 28 U.S.C. § 1291. This Court is the appropriate appellate court to hear this appeal, pursuant to 28 U.S.C. § 1294(1).

## STATEMENT OF ISSUES

This appeal concerns two issues:

(1) Whether the PPACA's individual mandate, which requires that nonexempt individuals must maintain health insurance coverage, violates the Constitution's Commerce Clause, U.S. Const. art. I § 8, cl. 3.

(2) Whether the PPACA's shared responsibility payment, which levies a tax on individuals who do not maintain health insurance coverage, is a bill for raising revenue that originated in the Senate in violation of the Constitution's Origination Clause, U.S. Const. art. I § 7, cl. 1.

## STATEMENT OF FACTS

Appellant Matt Sissel is an artist and small-business owner from Iowa, who now resides in Washington State. App. at 4. He works out of a studio and sells his art to the public. App. at 4. A decorated Iraq War veteran, Sissel now also works part-time for the Washington National Guard.

Sissel is financially stable, has an annual income that requires him to file federal tax returns, and could afford to purchase a health insurance policy. App. at 4. However, Sissel does not have, need, or want health insurance. App. at 4. He has been without health insurance coverage since before the PPACA was enacted in 2010, except for a short period in 2012-2013 when he was insured through the National Guard. App. at 4, 43-46. Sissel is able to pay (and does pay) for his medical expenses out-of-pocket. App. at 4, 9-10. Sissel has chosen this route because he believes that he should allocate his personal finances as much as possible toward growing his business, and not toward paying expensive health insurance premiums for coverage he does not need. App. at 10. Nevertheless, the PPACA's "individual mandate" obligates Sissel to buy government-approved health insurance. 26 U.S.C. § 5000A(a). And if he chooses not to buy the prescribed insurance, the PPACA requires him to pay a tax called the "shared responsibility payment." 26 U.S.C. § 5000A(b).

In 2010, Sissel sued Appellees United States Department of Health and Human Services, *et al.*, to enjoin enforcement of the PPACA.  Sissel's complaint included one claim, alleging that the individual mandate exceeds Congress's authority under the Commerce Clause.  The case was stayed to await the Supreme Court's resolution of *National Federation of Independent Business v. Sebelius*, 132 S. Ct. 2566 (2012) (*NFIB*).  The Supreme Court issued the *NFIB* opinion in June, 2012, and held that the PPACA's individual mandate violates the Commerce Clause.  The *NFIB* Court also held that the tax levied on those who go without the federally prescribed health insurance coverage is a legitimate exercise of Congress's taxing power.  Following the *NFIB* decision, the district court permitted Sissel to amend his complaint to include a claim alleging that the tax is an unconstitutional bill for raising revenue that originated in the Senate, in violation of the Origination Clause, U.S. Const. art. I § 7, cl. 1.  App. at 12-14.

The district court issued an opinion dismissing Sissel's case under FRCP 12(b)(6) on June 28, 2013.  App. at 122-44.  The lower court determined that Sissel had failed to state a Commerce Clause claim upon which relief could be granted, despite the Supreme Court's Commerce Clause ruling on the individual mandate in *NFIB*.  App. at 127-31.  The district court also ruled that the tax was not a bill for raising revenue, and that, even if it were, it originated in the House.  App. at 131-43.  Sissel now appeals the district court's opinion as to both of his claims.

## SUMMARY OF ARGUMENT

This Court should reverse the district court's order dismissing Sissel's amended complaint.   Sissel alleges in his first claim that the PPACA's individual mandate—which requires him to buy government-approved health insurance—cannot be sustained under the Commerce Clause.  App. at 11-12.  Sissel does not fail to state a claim upon which relief can be granted.  To the contrary, his Commerce Clause claim is consistent with the Supreme Court's ruling in *NFIB*, in which a majority of the Court held that the individual mandate exceeds Congress's authority under the Commerce Clause.  *NFIB*, 132 S. Ct. at 2585-2601 (opn. of Roberts, C.J.), 2642-50 (Scalia, Kennedy, Thomas, Alito, JJ., dissenting).   The district court erroneously concluded that the *NFIB* Court upheld the *individual mandate* as a legitimate exercise of Congress's taxing power—meaning that Sissel will be in noncompliance with the law if he fails to purchase health insurance by January, 2014.  App. 127-31.  In truth, the *NFIB* Court did not uphold the *individual mandate* at all, but only the tax on those who fail to purchase the federally prescribed health insurance coverage, which it characterized as essentially voluntary.  *NFIB*, 132 S. Ct. at 2597.

Second, Sissel states a claim under the Origination Clause.   The shared responsibility payment is a tax that raises revenues that go to the Treasury for general government operations—not to support a specific program.  It is thus a tax subject to the Origination Clause.  *See United States v. Munoz-Flores*, 495 U.S. 385, 399-400

(1990). And, as the *NFIB* Court held, Congress imposed the PPACA tax as an exercise of its taxing power—not its Commerce Clause power or any other enumerated power. Thus, to be constitutional, the tax *had* to originate in the House. But the tax originated in the *Senate*, rendering it unconstitutional under the Origination Clause.

## ARGUMENT

### I

### THE STANDARD OF REVIEW IS *DE NOVO*

This Court engages in *de novo* review of the district court's dismissal of a complaint for failure to state a claim upon which relief can be granted. *Atherton v. Dist. of Columbia Office of the Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009). The Court must accept as true all of the allegations contained in the complaint, *id.* (citing *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)), and may not affirm the dismissal "'even if it strikes a savvy judge that . . . recovery is very remote and unlikely,'" *id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)), so long as the complaint contains sufficient allegations to state a claim for relief that is plausible on its face. *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Sissel's amended complaint does state a claim under the Commerce and Origination Clauses. Thus, the decision below should be reversed.

## II

## THE INDIVIDUAL MANDATE EXCEEDS
## CONGRESS'S COMMERCE CLAUSE AUTHORITY

Sissel seeks a declaratory judgment and an injunction holding that the Commerce Clause does not authorize Congress to impose the individual mandate—the provision of the PPACA that requires him to buy health insurance. 26 U.S.C. § 5000A(a). He anchors this claim in the Supreme Court's opinion in *NFIB*, which holds that the individual mandate exceeds Congress's Commerce Clause authority because rather than "regulat[ing] Commerce . . . among the several States," as the Constitution provides, U.S. Const. art. I § 8, that statute purports to compel individuals to engage in commerce. The *NFIB* Court recognized that this is beyond Congress's power, and held "that our Constitution protects us from federal regulation under the Commerce Clause so long as we abstain from the regulated activity." 132 S. Ct. at 2599. Chief Justice Roberts explained further that "the Commerce Clause does not authorize such a command," *id.* at 2600, a position in which he was joined by four dissenting Justices. *See id.* at 2643 (Scalia, Kennedy, Thomas, Alito, JJ., dissenting) ("The Act before us here exceeds federal power . . . in mandating the purchase of health insurance.").

Despite the Supreme Court's opinion invalidating the individual mandate, the court below ruled that Sissel failed to state a Commerce Clause claim upon which

relief can be granted. App. at 127-31. It held that Sissel's case does not implicate the Commerce Clause, because the individual mandate is a legitimate exercise of Congress's taxing power. App. 127-31. This is a misreading of the *NFIB* decision. The Supreme Court did not sustain the individual mandate under the taxing power; indeed, the Supreme Court did not sustain the individual mandate at all.

**A. The *NFIB* Court Upheld the Shared Responsibility Payment As a Tax, But Invalidated the Individual Mandate Under the Commerce Clause**

The *NFIB* opinion makes an essential constitutional distinction between the individual mandate—which compels people to buy health insurance—and the shared responsibility payment—which imposes a tax on people who choose not to purchase health insurance. *See* 26 U.S.C. § 5000A(a)-(b). In Part III-A of his opinion in *NFIB*, Chief Justice Roberts explained that the "individual mandate"—defined as the provision that "requires individuals to purchase a health insurance policy," 132 S. Ct. at 2577 (opn. of Roberts, C.J.)—cannot be sustained under the Commerce Clause because it "forces individuals into commerce precisely because they elected to refrain from commercial activity." *Id.* at 2591 (opn. of Roberts, C.J.). The four dissenting Justices agreed with this conclusion, thereby forming a majority position on the

Commerce Clause issue.[1]  *Id.* at 2644-50 (Scalia, Kennedy, Thomas, Alito, JJ., dissenting).

Because the Commerce Clause does not support the individual mandate, the Chief Justice reasoned in Part III-B of his opinion that the government could prevail only if the Court construed the PPACA as laying a tax on people who fail to buy health insurance.  *Id.* at 2593-94 (opn. of Roberts, C.J.).  But it is imperative to notice what, *exactly*, the *NFIB* Court sustained under the taxing power.  In Part III-C, the Chief Justice—writing for the Court—explained that the "*exaction* the Affordable

---

[1] Courts and legal scholars are in disarray about the precedential value of the Chief Justice's Commerce Clause opinion in *NFIB*.  *Compare United States v. Kiste*, No. 3:12-CR-113-JD, 2013 WL 587556, at *4 (N.D. Ind. Feb. 13, 2013) (assuming, without deciding, that *NFIB* set precedent on Commerce Clause); *United States v. Loudner*, No. CR 12-30144-RAL, 2013 WL 357494, at *4 (D.S.D. Jan. 29, 2013) (applying Chief Justice's opinion as a holding); *United States v. Lott*, 912 F. Supp. 2d 146, 152 (D. Vt. 2012) (same); Randy E. Barnett, *No Small Feat: Who Won the Health Care Case (and Why Did So Many Law Professors Miss the Boat)?*, 65 Fla. L. Rev. 1331, 1336-37 (2013); Gary Lawson, *Night of the Living Dead Hand: The Individual Mandate and the Zombie Constitution*, 81 Fordham L. Rev. 1699, 1700 n.6 (2012-2013) (same), *with United States v. Spann*, No. 3:12-CR-126-L 2012, WL 4341799, at *3 (N.D. Tex. Sept. 24, 2012) (declining to adopt Chief Justice's Commerce Clause analysis as binding precedent); Alicia Oullette, *Health Reform and the Supreme Court: The ACA Survives the Battle of the Broccoli and Fortifies Itself Against Future Fatal Attack*, 76 Alb. L. Rev. 87, 101 (2013) (suggesting that Chief Justice's Commerce Clause opinion is dicta).  *See also Liberty Univ., Inc. v. Lew*, No. 10-2347, 2013 WL 3470532, at *10 n.7 (4th Cir. July 11, 2013) (acknowledging but not deciding dispute over the precedential effect of Chief Justice Roberts's opinion); *United States v. Roszkowski*, 700 F.3d 50, 58 n.3 (1st Cir. 2012) (same); *United States v. Henry*, 688 F.3d 637, 641 n.5 (9th Cir. 2012) (same).  A favorable ruling from this Court on Sissel's Commerce Clause claim will help dispel the confusion surrounding this issue.

Care Act imposes on those without health insurance looks like a tax in many respects." *Id.* at 2594 (emphasis added). The majority reasoned that the "'[s]hared responsibility payment,' as the statute entitles it," bears the hallmarks of a constitutional tax, including that it is collected by the IRS, is paid into the Treasury when taxpayers file their returns, does not apply to certain classes of people based on income, and produces revenue for the government to spend on whatever it chooses. *Id.* Part III-C, which constitutes a majority opinion, concludes that "[t]he Affordable Care Act's requirement that certain individuals *pay a financial penalty for not obtaining health insurance* may reasonably be characterized as a tax." *Id.* at 2600 (emphasis added). Thus, the Court upheld the shared responsibility payment—found in 26 U.S.C. § 5000A(b)—because it is legitimately based on Congress's authority to require individuals to pay taxes to the federal government.

The Supreme Court's opinion upholding a "tax on going without health insurance," 132 S. Ct. at 2599, thus rests on the distinction between the individual mandate in 26 U.S.C. § 5000A(a)—which could not withstand Commerce Clause scrutiny—and the shared responsibility payment in 26 U.S.C. § 5000A(b)—which survives under the taxing power. *Id.* Indeed, Chief Justice Roberts highlighted that distinction in the plainest possible terms in Part III-D of his opinion:

> The Federal Government does not have the power to order people to buy health insurance. Section 5000A would therefore be unconstitutional if read as a command. The Federal Government does have the power to

- 9 -

impose a tax on those without health insurance.  Section 5000A is therefore constitutional, because it can reasonably be read as a tax.

*Id.* at 2600-01 (opn. of Roberts, C.J.).  The Supreme Court therefore did *not* hold that the individual mandate survives under Congress's power to lay and collect taxes.  It determined that the shared responsibility payment is a tax, and that *it* is constitutional.  The individual mandate is therefore not a command, but a condition on which the tax is predicated.

Post-*NFIB* opinions from this Court's sister Circuits confirm this reading of *NFIB*.  Recently, the Fourth Circuit found that "[f]ive members of the [Supreme] Court . . . concluded that the individual mandate exceeds Congress's power under the Commerce Clause."  *Liberty Univ., Inc.*,  2013 WL 3470532, at *4.  The First and Sixth Circuits came to the same conclusion.  *United States v. Rose*, 714 F.3d 362, 370-71 (6th Cir. 2013) (explaining that, under *NFIB*, individual mandate cannot be sustained under Commerce Clause because it compels individuals to buy insurance); *United States v. Roszkowski*, 700 F.3d 50, 58 (1st Cir. 2012) (same).  Importantly, the Fourth Circuit distinguished the individual mandate from the shared responsibility payment, recognizing that "the Commerce Clause does not grant Congress the authority to 'compel' or 'mandate' an individual to enter commerce by purchasing a good or service," *Liberty Univ.*, 2013 WL 3470532, at *9, but finding that the "individual mandate exaction" is a constitutional tax.  *Id.* at *13-14; *see also U.S.*

*Citizens Ass'n v. Sebelius*, 705 F.3d 588, 597 (6th Cir. 2013) (describing shared responsibility payment as a tax); *Kinder v. Geithner*, 695 F.3d 772, 775 (8th Cir. 2012) (same).    Other courts have thus recognized that the *NFIB* Court held the individual mandate unconstitutional under the Commerce Clause, while upholding only the shared responsibility payment under Congress's taxing power.

That is the distinction on which Sissel bases his Commerce Clause claim.[2] And the distinction is critical to the decision in this case, because if the language in *NFIB* regarding the limits of the Commerce Clause *is* non-binding dicta, then this Court and the district court would have no need to decide the merits of Sissel's Origination Clause arguments.    This Court could simply affirm dismissal of Sissel's Complaint

---

[2]  Even this Court concluded, in a Commerce Clause challenge to the individual mandate that was decided prior to *NFIB*, that the individual mandate and penalty (*i.e.*, tax) should be viewed independently: "The individual mandate and the shared responsibility payment create different legal obligations, for different categories of people, at different times.  The mandate—described as the 'requirement to maintain minimum essential coverage' in the statute—imposes a legal obligation on 'applicable individual[s]' to purchase and maintain minimum health care coverage from an insurance company for each month beginning January 2014. . . . By contrast, the penalty provisions are not symmetrical with the mandate.  Although some who fail to comply with the individual mandate must pay a penalty (the 'shared responsibility payment') to the IRS, others—taxpayers who cannot afford coverage, or who fall below the filing threshold, members of Indian tribes, and any applicable individual whom the Secretary of Health and Human Services deems to have suffered a hardship—do not.  Moreover the purchase of health insurance is not to be directed to the Government, as is true of taxes, but rather to private insurers; it is only the penalty that flows to the Government." *Seven-Sky v. Holder*, 661 F.3d 1, 9 (D.C. Cir. 2011), *abrogated by NFIB*, 132 S. Ct. 2566 (footnotes omitted).

- 11 -

by holding that *NFIB* does not alter this Court's decision upholding the individual mandate under the Commerce Clause. *Seven-Sky*, 661 F.3d at 15-20. Such a holding would render it unnecessary to decide Sissel's other allegations. *See Windsor v. Evans*, 403 F. Appx. 527, 528 (D.C. Cir. 2010) (per curiam) ("This court may affirm the district court's dismissal of the appellant's complaint on any ground that supports the judgment.").

**B. The District Court's Opinion Upholding the Individual Mandate in Spite of *NFIB* Means Sissel Will Be Required To Buy Insurance He Does Not Need or Want**

By upholding the individual mandate, the district court's opinion will bring about the very injury Sissel seeks to avoid. If the individual mandate is valid, it will require Sissel to acquire insurance coverage by January 1, 2014. *See* 26 U.S.C. § 5000A(a). While the shared responsibility payment obligates Sissel only to pay a tax if he does not choose to buy insurance, the individual mandate renders Sissel a violator of federal law if he fails to buy the prescribed insurance.

The Supreme Court addressed this problem in *NFIB*. In Part III-C, the Court explained that upholding the shared responsibility payment as only a tax would not result in the same degree of coercion as upholding the individual mandate under the Commerce Clause, because "the taxing power is limited to requiring an individual to pay money into the Federal Treasury, no more. If a tax is properly paid, the Government has no power to compel or punish individuals subject to it." *NFIB*, 132

S. Ct. at 2600. By contrast, laws enacted to regulate commerce bring the full weight of the federal government to bear on individual behavior. *See id.* ("An individual who disobeys [a regulation of commerce] may be subjected to criminal sanctions . . . includ[ing] not only fines and imprisonment, but all the attendant consequences of being branded a criminal.").

The Supreme Court rejected the government's interpretation of the Commerce Clause in *NFIB* because it would have given Congress nearly limitless power to control individuals' behavior through the imposition of compulsory rules and requirements. The Court allowed the shared responsibility payment to stand, because it levies only a tax, and leaves individuals free to choose whether or not to engage in behavior that triggers the tax. *Id.* at 2599.

The court below ignored this distinction and upheld the individual mandate itself, not merely the payment requirement. App. at 127-31. This was contrary to the *NFIB* decision. The district court's ruling has a significant effect on Sissel, who will be rendered non-compliant with the PPACA if he fails to buy health insurance. This Court should reverse the district court and hold that Sissel properly states a claim for relief under the Commerce Clause, consistent with the Supreme Court's opinion in *NFIB*.

## III

## THE TAX LEVIED AGAINST INDIVIDUALS WITHOUT HEALTH INSURANCE VIOLATES THE ORIGINATION CLAUSE

### A. The Origination Clause Applies to the Shared Responsibility Payment

The Origination Clause provides: "All Bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with amendments as on other bills."  U.S. Const. art. I, § 7, cl. 1.  Taxes that are only imposed pursuant to Congress's enumerated power to "lay and collect Taxes"—as opposed to tax penalties meant to enforce laws that are passed under some *other* enumerated power (like the Commerce Clause)—are subject to the Origination Clause requirement.  All taxes are presumptively designed to "raise[] revenue to support the government generally," *Munoz-Flores*, 495 U.S. at 397-98, and are presumptively subject to the Origination Clause requirement.  There are two exceptions, however.

First, the Origination Clause does not apply to bills that "create[] a particular governmental program and . . . raise revenue to support that program."  *Id.*  For example, in *Munoz-Flores*, the Supreme Court held that a monetary assessment on defendants convicted of federal misdemeanors was not a "bill for raising revenue" because receipts went, not into the general Treasury, but into a special Crime Victims Fund which was earmarked for compensating and assisting federal crime victims.  *Id.*

- 14 -

at 398. The monetary assessment furthered Congress's law enforcement powers.

Similarly, in *Millard v. Roberts*, 202 U.S. 429, 437 (1906), the Supreme Court upheld

a federal tax against an Origination Clause challenge, because revenue was allocated

to railroad companies for the express purpose of financing railroad projects in the

District of Columbia, over which Congress has exclusive jurisdiction "in all Cases

whatsoever." U.S. Const. art. I, § 8, cl. 17. And in *Twin City Bank v. Nebeker*, 167

U.S. 196 (1897), the Court upheld a tax on bank notes because it was imposed for the

purpose of financing the cost of establishing a national currency—*i.e.*, in furtherance

of Congress's power to coin money. It was therefore a "bill[] for other purposes

which may incidentally create revenue." *Id.* at 202.

The second exception covers taxes devised to enforce compliance with a statute

passed under some constitutional power other than the taxing power. These are

"penalty assessments," which "are analogous to fines" and therefore "not taxes."

*United States v. Ashburn*, 884 F.2d 901, 904 (6th Cir. 1989). As the Sixth Circuit

explained in *Rodgers v. United States*, 138 F.2d 992 (6th Cir. 1943), "[t]here is a

marked distinction between taxation for revenue . . . and the imposition of sanctions

by the Congress under the commerce clause." *Id.* at 994. *Rodgers* held that the

Constitution's various limits on the taxing power "relate[] solely to taxation generally

for the purpose of revenue only, and not impositions made incidentally under the

commerce clause." *Id.* at 995. The exaction at issue in that case "ha[d] for its object

- 15 -

the fostering, protecting and conserving of interstate commerce . . . . Revenue may incidentally arise therefrom, but that fact [did] not divest the regulation of its commerce character and render it an exercise of the taxing power." *Id.* Thus restrictions such as the Apportionment requirement or the Origination Clause would not apply.

Unlike *Munoz-Flores*, *Millard*, *Nebeker*, or *Rodgers*, the tax here is an exercise *solely* of Congress's tax power, and raises revenue generally to fund the government, much like the income tax. *NFIB*, 132 S. Ct. at 2594 (comparing the shared responsibility payment tax to a tax on "earning income"). The tax is paid into the Treasury when individuals file their tax returns, and the amount is based on "such familiar factors as taxable income, number of dependents, and joint filing status." *Id.* The requirement to pay is found in the Internal Revenue Code and is enforced by the IRS, which "must assess and collect it 'in the same manner as taxes.'" *Id.* (citing 26 U.S.C. § 5000A(g)). The tax produces "considerable revenue" for the Government, *id.* at 2596—"about $4 billion per year by 2017." *Id.* at 2594. And this money is not earmarked to finance or defray the cost of any particular government program. Instead, it goes into the general fund for expenditure on whatever the government chooses—as with any other tax.

Most importantly, the *NFIB* Court concluded that the tax in 26 U.S.C. § 5000A(b) does not further the congressional exercise of any other enumerated

power, and it is *not* a penalty to ensure compliance with a statute passed under the Commerce Clause. On the contrary, the Court went out of its way to hold that the tax is *only* "a tax, not a penalty." *NFIB*, 132 S. Ct. at 2595. It contrasted the case of *Bailey v. Drexel Furniture Co.*, 259 U.S. 20 (1922), in which what had been labeled a tax was in reality a penalty; the *NFIB* Court held that it was faced with the reverse situation: what was called a penalty was instead a tax. *See* 132 S. Ct. at 2596 ("The reasons the Court in *Drexel Furniture* held that what was called a 'tax' there was a penalty support the conclusion that what is called a 'penalty' here may be viewed as a tax."). The *NFIB* decision emphasizes repeatedly that the tax in section 5000A(b) is not an enforcement penalty. It necessarily follows that the Origination Clause exceptions recognized in *Munoz-Flores*, *Rodgers*, *Ashburn*, and other cases, cannot apply here.

**B. The Decision Below Adopted a New "Purposive" Exception to the Origination Clause That Ignores Binding Supreme Court Precedent**

The court below rejected this analysis in favor of a vague "purposive approach," inquiring into the legislative motives of Congress in enacting the tax. App. at 133. It noted that "the individual mandate (and its associated shared responsibility payment) are 'plainly designed to expand health insurance coverage.'"

- 17 -

App. at 135 (quoting *NFIB*, 132 S. Ct. at 2496, and citing *Seven-Sky*, 661 F.3d at 6).[3] It therefore concluded that the tax is not a bill "for raising Revenue," but for achieving the goal of universal coverage—which it held exempts the tax from Origination Clause review. The court's analysis is flawed.

First, no precedent supports such an approach. No court ever has insulated a tax imposed exclusively pursuant to Congress's tax power—and in furtherance of no other enumerated power—from the Origination Clause on such grounds. Whenever the Supreme Court has upheld a tax or assessment against an Origination Clause challenge, it has done so under the theory that the tax or assessment is only an incidental effect of a statute designed to finance, or promote compliance with, a program enacted under a specific enumerated power, as in *Nebeker*, or to operate a discrete program with an earmarked special fund, as in *Munoz-Flores*.

Second, the fact that the tax at issue is intended to influence conduct cannot insulate it from the Origination Clause. "[T]axes that seek to influence conduct are nothing new." *NFIB*, 132 S. Ct. at 2596. Indeed, the Supreme Court observed in *NFIB* that "*[e]very* tax is in some measure regulatory." *Id.* (quoting *Sonzinsky v.*

---

[3] It is true that this Court in *Seven-Sky* concluded that "congressional findings never suggested that Congress's purpose was to raise revenue." *Seven-Sky*, 661 F.3d at 6. But that conclusion was based on this Court's characterization of the shared responsibility payment as a *penalty* enforcing the legal obligation that Americans purchase health insurance. *NFIB* made clear that the payment is not a penalty, but a tax imposed pursuant to Congress's tax power.

*United States*, 300 U.S. 506 (1937) (emphasis added)). If true, then—according to the district court's analysis—*every* tax would be immune from an Origination Clause challenge, simply because the government could easily identify some regulatory purpose behind the tax. The result would be to create a massive loophole for the Senate to originate revenue-raising bills without regard to the Origination Clause. The Senate could simply originate a bill levying a tax on Americans who failed to purchase an unpopular or expensive good or service, thereby guaranteeing to the Treasury a steady and substantial stream of revenue to support the government generally. Under the district court's rationale, so long as the Senate included findings in the bill that its alleged purpose was to encourage the purchase of that good or service, its bill could avoid the Origination Clause entirely. Thus, to adopt the district court's conclusion would be to render the Origination Clause a dead letter. This would fly in the face of the *NFIB* Court's assurances that the taxing power "is not without limits," 132 S. Ct. at 2599, and that "while this Court sits," the judicially enforceable restrictions on the taxing power—of which the Origination Clause is one—would be "aggressively" enforced. *Id.* at 2600.

The tax in this case undisputedly raises revenue, which goes to the Treasury and supports general government operations. Having all the hallmarks of a revenue-raising bill, the shared responsibility payment clearly falls within the purview of the

Origination Clause, *even if* it has the additional purpose of encouraging the purchase of health insurance.

## C. The Shared Responsibility Payment Unconstitutionally Originated in the Senate, Not the House

Despite the fact that the shared responsibility payment is a bill for raising revenue, it originated in the Senate, not the House.  In September 2009, Congress unanimously passed House Resolution (H.R.) 3590, entitled the "Service Members Home Ownership Tax Act of 2009."  The bill would have "amend[ed] the Internal Revenue Code of 1986 to modify first-time homebuyers credit in the case of members of the Armed Forces and certain other Federal employees."  The bill had nothing to do with the PPACA or health care reform.  In November of that year, the Senate "amended" the House bill by gutting its contents, replacing those contents with health-insurance legislation (including the individual mandate and shared responsibility payment), and renaming the bill the "Patient Protection and Affordable Care Act."  155 Cong. Rec. S11888 (Nov. 20, 2009) (record of Senate debate over substitution of H.R. 3590 with PPACA); *id.* at 11889-90 (Senator Snowe remarking that the Senate "has resorted to this convoluted process before us in which we first vote to proceed to an empty shell bill, which is then replaced with actual health reform legislation"); 9 CIS S962194 (Congressional Information Service (CIS) reporting that "Text of the Patient Protection and Affordable Care Act was proposed

- 20 -

in the Senate as a substitute to H.R. 3590, the Service Members Home Ownership Tax Act of 2009").

This was not a lawful "amendment" of H.R. 3590 as required by the Origination Clause, because the subject matter of the one had nothing whatsoever to do with the other. The Supreme Court has held that a bill resulting from the Senate's amendment of a House-originated, revenue-raising bill can withstand Origination Clause scrutiny only if the amendment is "germane to the subject matter of the [House] bill." *Flint v. Stone Tracy Co.*, 220 U.S. 107, 143 (1911). The PPACA—which originated in the Senate—was not germane to H.R. 3590, which was a bill that did *not* raise revenue and did *not* concern health-insurance reforms.

The germaneness requirement in *Flint*, which was reaffirmed in *Rainey v. United States*, 232 U.S. 310 (1914), is dictated by the constitutional provision allowing the Senate to "propose or concur with Amendments as on other Bills." U.S. Const. art. I, § 7, cl. 1. For a Senate proposal to qualify as an "amendment" logically entails that it be germane to the original, House-created measure. Indeed, the authors of that Clause recognized that it would limit the Senate's amendment power by barring the Senate from rewriting House-passed bills under the guise of an amendment, which is what occurred here. At the Constitutional Convention, James Madison, who *opposed* the Origination requirement, did so because it would generate disputes if the Senate were to add "obnoxious" provisions which would constitute

"origination under the name of an amendment." 2 *The Founders' Constitution* 281 (P. Kurland & R. Lerner eds., 1987). "The Senate may actually couch extraneous matter under that name," he warned, in which case "the question will turn on the degree of connection between the matter & object of the bill and the alteration or amendment offered to it." *Id.* Congressman James Randolph echoed this understanding in 1807 when he argued that "a fair construction" of the Senate's power to amend revenue bills "will confine it to the details of the bill, and restrain them from affecting the leading principles . . . . For if they possess the power of varying the objects or altering the quantum, the power reserved to this House is illusory." Annals of Cong. 9th Cong. 2d Sess. 630 (1807). The House sustained Randolph's argument, *id.* at 636, and it has maintained this commonsense understanding of the power to amend repeatedly since. *See* 2 *Hind's Precedents of The U.S. House of Representatives* 942-74 (1907). Modern scholars, too, have noted that Senate alterations that radically change the nature of a House-passed bill cannot be fairly called "amendments." *See, e.g.*, William McKay & Charles W. Johnson, *Parliament and Congress: Representation and Scrutiny in the Twenty-First Century* 181 (2010).[4]

---

[4] The district court expressed concern that meaningful judicial enforcement of the germaneness requirement would intrude on legislative prerogatives, App. at 140-43. But states have for more than a century enforced such an amendment/revision
(continued...)

The germaneness requirement has been repeatedly reaffirmed by Courts of Appeals. *See, e.g.*, *United States v. Munoz-Flores*, 863 F.2d 654, 661 (9th Cir. 1988), *rev'd on other grounds*, 495 U.S. 385 (1990) ("[T]he power of the Senate to amend a bill originating in the House is not unlimited.  The Senate's amendment must be germane to the subject matter of the House bill."); *Armstrong v. United States*, 759 F.2d 1378, 1381-82 (9th Cir. 1985) ("*[A]ll* legislation relating to taxes . . . must be initiated in the House," although "once a revenue bill has been initiated in the House, the Senate is fully empowered to propose amendments, even if their effect will be to transform *a proposal lowering taxes* [] into one raising taxes." (emphasis added)). The germaneness requirement is the only thing that prevents the Senate from abusing its power to amend as a means of evading the Origination Clause. *See also Sperry Corp. v. United States*, 12 Cl. Ct. 736, 742 (1987), *rev'd on other grounds*, 853 F.2d 904 (Fed. Cir. 1988) ("[T]he Senate . . . may not attach a revenue raising bill to a non-revenue raising House bill.").

If the Origination Clause has *any* meaning, it must be to bar the Senate from creating from scratch any bills for raising revenue.  While the Senate may in most

---

[4] (...continued)
distinction. *See, e.g.*, *Strauss v. Horton*, 46 Cal. 4th 364, 425-40 (2009).  And *whatever* degree of deference Congress may enjoy in determining the germaneness of a Senate amendment, it would be exceeded here—where the original nonrevenue measure was entirely replaced by a Senate-authored bill for raising revenue, which had absolutely nothing in common with the House-passed measure.

cases have the power to "gut-and-amend" a bill by striking and replacing its entire contents,[5] no court has ever held that the Senate can use such a procedure to originate a bill for raising revenue. On the contrary, every court to address the question has held that the Senate must respect the Origination Clause, and that "courts will strike down a law when Congress has passed it in violation of [that Clause]." *Munoz-Flores*, 495 U.S. at 396. To be clear: Sissel does *not* challenge the gut-and-amend procedure generally; he challenges the constitutionality of *a bill for raising revenue* which originated in the Senate through the use of that device.

Courts reviewing previous Origination Clause challenges have been conscientious about requiring that any Senate amendment must be to a House-approved *bill for raising revenue*, and that the Senate may not take a House-approved bill that is *not for raising revenue* and transform it through a purported amendment into a bill for raising revenue. Since H.R. 3590 was not a bill for raising revenue when it originated in the House, the procedure by which the Senate made it for the first time into a bill for raising revenue can find no shelter in any precedent.

---

[5] The Senate's own rules regard legislation that, like PPACA, begins in the Senate as an amendment in the nature of a substitute as having *originated* in the *Senate*. *See* Alan S. Frumin, ed., *Riddick's Senate Procedure* 90 (1992) ("In the case of a complete substitute for a bill . . . the text proposed to be inserted . . . [is] regarded for the purpose of amendment as a question or as original text and not as an amendment in the first degree.").

The lower court doubted the existence of a "germaneness" requirement; in its view, a revenue-raising bill can originate in the Senate as a so-called "amendment" to *any* House bill—whether or not the House bill is a bill for raising revenue. App. at 139-40. But *Flint*, *Munoz-Flores*, and other cases are unambiguous that the Origination Clause imposes real restraints. In *Flint*, the House passed a bill creating one kind of tax, which the Senate amended by replacing it with a different kind of tax. 220 U.S. at 143. The Supreme Court ruled this permissible because the final bill "originated in the House of Representatives *and was there a general bill for the collection of revenue.*" *Id.* (emphasis added). The Senate's amendment was "germane to the subject-matter of the bill," so that it was "not beyond the power of the Senate to propose." *Id.*

Similarly, in *Rainey*, the Court upheld the tax because it "was proposed by the Senate as an amendment *to a bill for raising revenue which originated in the House.*" 232 U.S. at 317 (emphasis added). And the many cases challenging the constitutionality of the 1986 TEFRA tax increase involved a Senate replacement for a House-enacted bill that was itself a bill for raising revenue. *See, e.g., Boday v. United States*, 759 F.2d 1472, 1476 (9th Cir. 1985); *Frent v. United States*, 571 F. Supp. 739, 742 (E.D. Mich. 1983), *appeal dismissed*, 734 F.2d 14 (6th Cir. 1984). Here, by contrast, H.R. 3590 was *not* originally a bill for raising revenue. Unlike in the prior cases, the Senate's gut-and-amend procedure made H.R. 3590 for the first

- 25 -

time into a bill for raising revenue.  The precedents the government cites are therefore inapplicable.

The district court also doubted whether the "germaneness" question is justiciable.  Because the "germaneness" inquiry is central to most—if not all—Origination Clause challenges, its nonjusticiability would mean that most—if not all—Origination Clause challenges would escape judicial review.  But that is contrary to the Supreme Court's decision in *Munoz-Flores*, 495 U.S. at 396-98, which establishes that Origination Clause challenges *are* justiciable.  The majority concluded that "congressional consideration of constitutional questions does not foreclose subsequent judicial scrutiny of the law's constitutionality. On the contrary, this Court has the duty to review the constitutionality of congressional enactments." *Id.* at 391.

Finally, the district court concluded that even if "germaneness" were required and justiciable, that requirement—which imposes a "very loose conception of germaneness"—would  be satisfied here.  App. at 142.  In the district court's view, H.R. 3590 *was* a revenue-raising bill that was constitutionally amended by the Senate when it enacted the PPACA.  But the district court is factually wrong.  H.R. 3590 was not a revenue-raising bill.  The bill first and foremost *reduced* revenues to the Treasury by providing a first-time homebuyers tax credit to members of the Armed Forces and certain other Federal employees.  H.R. 3590.  The bill did raise corporate

- 26 -

taxes in order to offset the loss of revenues from the homebuyers tax credit. *Id.* Consequently, the bill was "deficit-neutral," neither raising nor reducing revenues to the Treasury. But even if H.R. 3590 were regarded as a bill for raising revenue in the first instance, the subsequent Senate "amendment" cannot be regarded as "germane" to its original text. The shell game by which the PPACA—which originated entirely in the Senate—was passed exceeds the commonsense understanding of the Senate's power to "amend" House-passed bills, the original meaning of that provision, and the controlling precedent of the Supreme Court regarding the Origination Clause's requirements.

# CONCLUSION

Sissel respectfully appeals to this Court to reverse the district court's dismissal of his amended complaint, because the PPACA's individual mandate cannot be sustained under the Commerce Clause, and the shared responsibility payment is a bill for raising revenue that did not comply with the Origination Clause.

DATED:  October 23, 2013.

Respectfully submitted,

PAUL J. BEARD II
TIMOTHY SANDEFUR
DANIEL A. HIMEBAUGH


By    /s/PAUL J. BEARD II
      PAUL J. BEARD II

Counsel for Plaintiff/Appellant
Matt Sissel

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I hereby certify

that the foregoing brief complies with type-volume limitation of Rule 32(a)(7)(B),

in that it contains 6,625words.

<u>    /s/PAUL J. BEARD II    </u>
PAUL J. BEARD II

# ADDENDUM

## STATUTES AND REGULATIONS

## TABLE OF CONTENTS

26 U.S.C.A. § 5000A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

26 U.S.C.A. § 5000A

§ 5000A. Requirement to maintain minimum essential coverage.

Effective: March 30, 2010
Currentness

**(a) Requirement to maintain minimum essential coverage.**—An applicable individual shall for each month beginning after 2013 ensure that the individual, and any dependent of the individual who is an applicable individual, is covered under minimum essential coverage for such month.

**(b) Shared responsibility payment.**—

**(1) In general.**—If a taxpayer who is an applicable individual, or an applicable individual for whom the taxpayer is liable under paragraph (3), fails to meet the requirement of subsection (a) for 1 or more months, then, except as provided in subsection (e), there is hereby imposed on the taxpayer a penalty with respect to such failures in the amount determined under subsection (c).

**(2) Inclusion with return.**—Any penalty imposed by this section with respect to any month shall be included with a taxpayer's return under chapter 1 for the taxable year which includes such month.

**(3) Payment of penalty.**—If an individual with respect to whom a penalty is imposed by this section for any month--

**(A)** is a dependent (as defined in section 152) of another taxpayer for the other taxpayer's taxable year including such month, such other taxpayer shall be liable for such penalty, or

**(B)** files a joint return for the taxable year including such month, such individual and the spouse of such individual shall be jointly liable for such penalty.

**(c) Amount of penalty.—**

**(1) In general.**—The amount of the penalty imposed by this section on any taxpayer for any taxable year with respect to failures described in subsection (b)(1) shall be equal to the lesser of–

**(A)** the sum of the monthly penalty amounts determined under paragraph (2) for months in the taxable year during which 1 or more such failures occurred, or

**(B)** an amount equal to the national average premium for qualified health plans which have a bronze level of coverage, provide coverage for the applicable family size involved, and are offered through Exchanges for plan years beginning in the calendar year with or within which the taxable year ends.

**(2) Monthly penalty amounts.**—For purposes of paragraph (1)(A), the monthly penalty amount with respect to any taxpayer for any month during which any failure described in subsection (b)(1) occurred is an amount equal to 1/12 of the greater of the following amounts:

**(A) Flat dollar amount.**—An amount equal to the lesser of—

**(i)** the sum of the applicable dollar amounts for all individuals with respect to whom such failure occurred during such month, or

**(ii)** 300 percent of the applicable dollar amount (determined without regard to paragraph (3)(C)) for the calendar year with or within which the taxable year ends.

**(B) Percentage of income.**—An amount equal to the following percentage of the excess of the taxpayer's household income for the taxable year over the amount of gross income specified in section 6012(a)(1) with respect to the taxpayer for the taxable year:

**(i)** 1.0 percent for taxable years beginning in 2014.

**(ii)** 2.0 percent for taxable years beginning in 2015.

(iii) 2.5 percent for taxable years beginning after 2015.

(3) **Applicable dollar amount.**—For purposes of paragraph (1)—

(A) **In general.**—Except as provided in subparagraphs (B) and (C), the applicable dollar amount is $695.

(B) **Phase in.**—The applicable dollar amount is $95 for 2014 and $325 for 2015.

(C) **Special rule for individuals under age 18.**—If an applicable individual has not attained the age of 18 as of the beginning of a month, the applicable dollar amount with respect to such individual for the month shall be equal to one-half of the applicable dollar amount for the calendar year in which the month occurs.

(D) **Indexing of amount.**—In the case of any calendar year beginning after 2016, the applicable dollar amount shall be equal to $695, increased by an amount equal to—

(i) $695, multiplied by

(ii) the cost-of-living adjustment determined under section 1(f)(3) for the calendar year, determined by substituting "calendar year 2015" for "calendar year 1992" in subparagraph (B) thereof.

If the amount of any increase under clause (i) is not a multiple of $50, such increase shall be rounded to the next lowest multiple of $50.

(4) **Terms relating to income and families.**—For purposes of this section--

(A) **Family size.**—The family size involved with respect to any taxpayer shall be equal to the number of individuals for whom the taxpayer is allowed a deduction under section 151 (relating to allowance of deduction for personal exemptions) for the taxable year.

(B) **Household income.**—The term "household income" means, with respect to any taxpayer for any taxable year, an amount equal to the sum of—

      **(i)** the modified adjusted gross income of the taxpayer, plus

      **(ii)** the aggregate modified adjusted gross incomes of all other individuals who—

          **(I)** were taken into account in determining the taxpayer's family size under paragraph (1), and

          **(II)** were required to file a return of tax imposed by section 1 for the taxable year.

    **(C) Modified adjusted gross income.**—The term "modified adjusted gross income" means adjusted gross income increased by--

      **(i)** any amount excluded from gross income under section 911, and

      **(ii)** any amount of interest received or accrued by the taxpayer during the taxable year which is exempt from tax.

    **[(D) Repealed.** Pub.L. 111-152, Title I, § 1002(b)(1), Mar. 30, 2010, 124 Stat. 1032]

**(d)**  **Applicable individual.**—For purposes of this section—

  **(1) In general.**—The term "applicable individual" means, with respect to any month, an individual other than an individual described in paragraph (2), (3), or (4).

  **(2) Religious exemptions.**—

    **(A)**   **Religious conscience exemption.**—Such term shall not include any individual for any month if such individual has in effect an exemption under section 1311(d)(4)(H) of the Patient Protection and Affordable Care Act which certifies that such individual is—

      **(i)**  a member of a recognized religious sect or division thereof which is described in section 1402(g)(1), and

**(ii)** an adherent of established tenets or teachings of such sect or division as described in such section.

**(B) Health care sharing ministry.**—

**(i) In general.**—Such term shall not include any individual for any month if such individual is a member of a health care sharing ministry for the month.

**(ii) Health care sharing ministry.**—The term "health care sharing ministry" means an organization--

**(I)** which is described in section 501(c)(3) and is exempt from taxation under section 501(a),

**(II)** members of which share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs and without regard to the State in which a member resides or is employed,

**(III)** members of which retain membership even after they develop a medical condition,

**(IV)** which (or a predecessor of which) has been in existence at all times since December 31, 1999, and medical expenses of its members have been shared continuously and without interruption since at least December 31, 1999, and

**(V)** which conducts an annual audit which is performed by an independent certified public accounting firm in accordance with generally accepted accounting principles and which is made available to the public upon request.

**(3) Individuals not lawfully present.**—Such term shall not include an individual for any month if for the month the individual is not a citizen or national of the United States or an alien lawfully present in the United States.

**(4)  Incarcerated individuals.**—Such term shall not include an individual for any month if for the month the individual is incarcerated, other than incarceration pending the disposition of charges.

**(e)  Exemptions.**—No penalty shall be imposed under subsection (a) with respect to—

**(1)  Individuals who cannot afford coverage.**—

**(A)  In general.**—Any applicable individual for any month if the applicable individual's required contribution (determined on an annual basis) for coverage for the month exceeds 8 percent of such individual's household income for the taxable year described in section 1412(b)(1)(B) of the Patient Protection and Affordable Care Act. For purposes of applying this subparagraph, the taxpayer's household income shall be increased by any exclusion from gross income for any portion of the required contribution made through a salary reduction arrangement.

**(B) Required contribution.**—For purposes of this paragraph, the term "required contribution" means—

**(i)** in the case of an individual eligible to purchase minimum essential coverage consisting of coverage through an eligible-employer-sponsored plan, the portion of the annual premium which would be paid by the individual (without regard to whether paid through salary reduction or otherwise) for self-only coverage, or

**(ii)** in the case of an individual eligible only to purchase minimum essential coverage described in subsection (f)(1)(C), the annual premium for the lowest cost bronze plan available in the individual market through the Exchange in the State in the rating area in which the individual resides (without regard to whether the individual purchased a qualified health plan through the Exchange), reduced by the amount of the credit allowable under section 36B for the taxable year (determined as if the individual was covered by a qualified health plan offered through the Exchange for the entire taxable year).

**(C)  Special rules for individuals related to employees.**—For purposes of subparagraph (B)(i), if an applicable individual is eligible for minimum

A-6

essential coverage through an employer by reason of a relationship to an employee, the determination under subparagraph (A) shall be made by reference to required contribution of the employee.

**(D) Indexing.**—In the case of plan years beginning in any calendar year after 2014, subparagraph (A) shall be applied by substituting for '8 percent' the percentage the Secretary of Health and Human Services determines reflects the excess of the rate of premium growth between the preceding calendar year and 2013 over the rate of income growth for such period.

**(2) Taxpayers with income below filing threshold.**—Any applicable individual for any month during a calendar year if the individual's household income for the taxable year described in section 1412(b)(1)(B) of the Patient Protection and Affordable Care Act is less than the amount of gross income specified in section 6012(a)(1) with respect to the taxpayer.

**(3) Members of Indian tribes.**—Any applicable individual for any month during which the individual is a member of an Indian tribe (as defined in section 45A(c)(6)).

**(4) Months during short coverage gaps.**—

**(A)  In general.**—Any month the last day of which occurred during a period in which the applicable individual was not covered by minimum essential coverage for a continuous period of less than 3 months.

**(B) Special rules.**—For purposes of applying this paragraph--

**(i)** the length of a continuous period shall be determined without regard to the calendar years in which months in such period occur,

**(ii)** if a continuous period is greater than the period allowed under subparagraph (A), no exception shall be provided under this paragraph for any month in the period, and

**(iii)** if there is more than 1 continuous period described in subparagraph (A) covering months in a calendar year, the exception provided by this paragraph shall only apply to months in the first of such periods.

The Secretary shall prescribe rules for the collection of the penalty imposed by this section in cases where continuous periods include months in more than 1 taxable year.

**(5) Hardships.**—Any applicable individual who for any month is determined by the Secretary of Health and Human Services under section 1311(d)(4)(H) to have suffered a hardship with respect to the capability to obtain coverage under a qualified health plan.

**(f)    Minimum essential coverage.**—For purposes of this section—

**(1) In general.**—The term "minimum essential coverage" means any of the following:

**(A)    Government sponsored programs.**—Coverage under—

**(i)** the Medicare program under part A of title XVIII of the Social Security Act,

**(ii)** the Medicaid program under title XIX of the Social Security Act,

**(iii)** the CHIP program under title XXI of the Social Security Act,

**(iv)** medical coverage under chapter 55 of title 10, United States Code, including coverage under the TRICARE program;

**(v)** a health care program under chapter 17 or 18 of title 38, United States Code, as determined by the Secretary of Veterans Affairs, in coordination with the Secretary of Health and Human Services and the Secretary,

**(vi)** a health plan under section 2504(e) of title 22, United States Code (relating to Peace Corps volunteers); or

**(vii)** the Nonappropriated Fund Health Benefits Program of the Department of Defense, established under section 349 of the National Defense Authorization Act for Fiscal Year 1995 (Public Law 103-337; 10 U.S.C. 1587 note).

**(B) Employer-sponsored plan.**—Coverage under an eligible employer-sponsored plan.

**(C) Plans in the individual market.**—Coverage under a health plan offered in the individual market within a State.

**(D) Grandfathered health plan.**—Coverage under a grandfathered health plan.

**(E) Other coverage.**—Such other health benefits coverage, such as a State health benefits risk pool, as the Secretary of Health and Human Services, in coordination with the Secretary, recognizes for purposes of this subsection.

**(2) Eligible employer-sponsored plan.**—The term "eligible employer-sponsored plan" means, with respect to any employee, a group health plan or group health insurance coverage offered by an employer to the employee which is—

**(A)** a governmental plan (within the meaning of section 2791(d)(8) of the Public Health Service Act), or

**(B)** any other plan or coverage offered in the small or large group market within a State.

Such term shall include a grandfathered health plan described in paragraph (1)(D) offered in a group market.

**(3) Excepted benefits not treated as minimum essential coverage.**—The term "minimum essential coverage" shall not include health insurance coverage which consists of coverage of excepted benefits--

**(A)** described in paragraph (1) of subsection (c) of section 2791 of the Public Health Service Act; or

**(B)** described in paragraph (2), (3), or (4) of such subsection if the benefits are provided under a separate policy, certificate, or contract of insurance.

A-9

**(4) Individuals residing outside United States or residents of territories.**—Any applicable individual shall be treated as having minimum essential coverage for any month—

  **(A)** if such month occurs during any period described in subparagraph (A) or (B) of section 911(d)(1) which is applicable to the individual, or

  **(B)** if such individual is a bona fide resident of any possession of the United States (as determined under section 937(a)) for such month.

**(5) Insurance-related terms.**—Any term used in this section which is also used in title I of the Patient Protection and Affordable Care Act shall have the same meaning as when used in such title.

**(g) Administration and procedure.—**

  **(1) In general.**—The penalty provided by this section shall be paid upon notice and demand by the Secretary, and except as provided in paragraph (2), shall be assessed and collected in the same manner as an assessable penalty under subchapter B of chapter 68.

  **(2) Special rules.**—Notwithstanding any other provision of law—

    **(A) Waiver of criminal penalties.**—In the case of any failure by a taxpayer to timely pay any penalty imposed by this section, such taxpayer shall not be subject to any criminal prosecution or penalty with respect to such failure.

    **(B) Limitations on liens and levies.**—The Secretary shall not—

      **(i)** file notice of lien with respect to any property of a taxpayer by reason of any failure to pay the penalty imposed by this section, or

      **(ii)** levy on any such property with respect to such failure.

**CREDIT(S)**
    (Added and amended Pub.L. 111-148, Title I, § 1501(b), Title X, § 10106(b) to (d), Mar. 23, 2010, 124 Stat. 244, 909; Pub.L. 111-152, Title I, §§ 1002, 1004(a)(1)(C), (a)(2)(B), Mar. 30, 2010, 124 Stat. 1032, 1034; Pub.L. 111-159,

§ 2(a), Apr. 26, 2010, 124 Stat. 1123; Pub.L. 111-173, § 1(a), May 27, 2010, 124 Stat. 1215.)

## ENACTMENT OF SECTION

<Pub.L. 111-148, Title I, § 1501(b), (d), Mar. 23, 2010, 124 Stat. 244, 249, provided that this section, as amended by Pub.L. 111-159, § 2(a), Apr. 26, 2010, 124 Stat. 1123 and Pub.L. 111-173, § 1(a), May 27, 2010, 124 Stat. 1215, shall apply to taxable years ending after Dec. 31, 2013.>

Notes of Decisions (38)

26 U.S.C.A. § 5000A, 26 USCA § 5000A
Current through P.L. 113-36 approved 9-18-13

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing APPELLANT'S OPENING BRIEF was electronically filed with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit on October 23, 2013, by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

   /s/PAUL J. BEARD II   
PAUL J. BEARD II
